# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>                              Plaintiff,<br><br>v.<br><br>Melvin Lee Gatlin,<br><br>                              Defendant. | Case No. 14-cr-327 (JNE/HB)<br><br><br>REPORT AND RECOMMENDATION |

Kevin S. Ueland, United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for United States of America

Shannon R. Elkins, Office of the Federal Defender, U.S. Courthouse, Suite 107, 300 South Fourth Street, Minneapolis, MN 55415, for Melvin Lee Gatlin

HILDY BOWBEER, United States Magistrate Judge

This case came before the undersigned United States Magistrate Judge for a pretrial motion hearing on December 15, 2014.  This case was referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. Trial is scheduled to commence before the Honorable Joan N. Ericksen, United States District Judge, on Monday, March 23, 2015.

The Court will address Defendant's Motion to Suppress Evidence [Doc. No. 27] in this Report and Recommendation.  The parties' nondispositive motions will be addressed in a separate Order.

## I.    Procedural Background

The Government filed a Criminal Complaint in this action on September 15, 2014, providing probable cause to believe that Defendant committed two counts of bank robbery in violation of 18 U.S.C. § 2113(a).  (Crim. Compl. [Doc. No. 1].)  The Complaint alleged that on September 12, 2014, Defendant knowingly and by intimidation took $721 from a Premier Bank teller and $7,245 from an Americana Community Bank teller.  On October 15, 2014, the Government filed an Indictment charging Defendant with the two counts of bank robbery described above, except the amount of the second alleged robbery was reduced to $7,060.  (Indictment [Doc. No. 10].)

On November 21, 2014, Defendant filed a motion to suppress evidence seized from his residence at 1341 Knox Avenue North in Minneapolis, Minnesota, and DNA evidence seized from his person.  (Def.'s Mot. Suppress [Doc. No. 27].)  The Government opposed the motion and notified the Court of its intent to present witness testimony.  (Gov't Resp. at 5 [Doc. No. 32]; Gov't Notice at 1 [Doc. No. 33].)

The Court held a hearing on the motion to suppress on December 15, 2014.  The Government called Maple Grove Police Detectives Jason Heilman and Laurel Slawson as witnesses, and introduced the following exhibits:

1.  Government Exhibit 1: a copy of an application for a search warrant for 1341 Knox Avenue North, Minneapolis, Minnesota; a motor vehicle identified as a grey 2014 Dodge Charger, MN license plate 997NMY; and the person of Melvin Lee Gatlin.  Government Exhibit 1 also included a copy of the first search warrant signed by Hennepin County District Judge Laurie J. Miller on September 12, 2014.

2.  Government Exhibit 2: a copy of an application for a search warrant for 1341 Knox Avenue North, Minneapolis, Minnesota; and a motor vehicle

2

identified as a grey 2014 Dodge Charger, MN license plate 997NMY.
Government Exhibit 2 also included a copy of the second search warrant
signed by Judge Miller on September 12, 2014.  The application and search
warrant in Government Exhibit 2 differed from those in Government
Exhibit 1 in that they listed the following property and things to seize: a
construction-style hard hat, a yellow traffic safety vest, clear safety style
glasses, sunglasses with light-colored frames, a black and grey satchel-style
bag, U.S. currency, U.S. currency in $20 bills marked with five listed serial
numbers, and a black or grey cellular phone with a globe symbol.

3.  Government Exhibit 3: a copy of a receipt, inventory, and return form dated
    September 12, 2014, for a yellow hard hat seized from the garage, safety
    glasses seized from a Cadillac, an orange-yellow safety vest seized from a
    Cadillac, four other safety vests, and $7,245 in cash seized from the
    basement of 1341 Knox Avenue North.

4.  Government Exhibit 4: a copy of a consent to search form for a Chevrolet
    Malibu, MN license plate 657LSL; a Cadillac, MN license plate 110KKT;
    and the detached garage of 1341 Knox Avenue North, Minneapolis.  The
    form was signed by Albreta Safford on September 12, 2014.

5.  Government Exhibit 5: a copy of a consent to search form for a 2000 Gold
    Chevrolet Tahoe, MN license plate 643BVG, signed by Patricia Warren on
    September 12, 2014.

Defendant called Albreta Safford to testify and introduced the following two

exhibits at the motion hearing:

1.  Defendant's Exhibit 1: a copy of a receipt, inventory, and return form dated
    September 12, 2014, listing a yellow hard hat seized from the garage, safety
    glasses seized from a Cadillac, an orange-yellow safety vest seized from a
    Cadillac, four other safety vests, a dog tag, three glasses, a dark bag with
    U.S. currency, three mailings for Defendant sent to the 1341 Knox Avenue
    North address, and two traffic vests.

2.  Defendant's Exhibit 2: a copy of a search warrant for 1341 Knox Avenue
    North, Minneapolis, Minnesota; Melvin Lee Gatlin; and a grey 2014 Dodge
    Charger, MN license plate 997NMY.  The warrant was signed by Judge
    Miller on September 12, 2014.  Defendant's Exhibit 2 is the same search
    warrant as that included in Government's Exhibit 1.

At the conclusion of the hearing, the parties requested and received permission to

file post-hearing memoranda on the issues raised by Defendant's motion to suppress.  To

accommodate Defendant's request to order a transcript of the hearing, the Court set the

deadline for Defendant's post-hearing memorandum as Tuesday, January 6, 2015, and the

Government's deadline to respond as Tuesday, January 13, 2015.  The Court took the

motion to suppress under advisement on January 13, 2015, after briefing was complete.

        In Defendant's post-hearing memorandum, he narrowed his motion to suppress to

evidence seized from 1341 Knox Avenue North, including the detached garage and

vehicles located therein.[1]  (Def.'s Mem. Supp. Mot. Suppress at 1, 14 [Doc. No. 43].)

Defendant provided three grounds for exclusion of the evidence: (1) the search warrant

lacked a sufficient nexus between the bank robberies and 1341 Knox Avenue North;

(2) the search warrant was facially invalid; and (3) Ms. Safford's consent to search her

garage and vehicles was involuntary and the fruit of an illegal search.  (*Id.* at 1.)

II.     **Factual Background[2]**

        A.      **The Bank Robberies and Identification of Defendant as a Suspect**

         On September 12, 2014, Detective Heilman learned of two robberies that had

occurred earlier that day, one at Americana Community Bank ("Americana") in Maple

Grove, Minnesota, and one at Premier Bank ("Premier") in Albertville, Minnesota.

(Mots. Hr'g Tr., Dec. 15, 2014 ("Tr.") at 7-8, 10 [Doc. No. 42].)  A Hennepin County

---

[1]  Defendant originally moved also to suppress DNA evidence seized from his person, but
no evidence or testimony on this issue was adduced at the motion hearing, and Defendant
did not discuss the issue in his post-hearing memorandum.  The Court therefore considers
the issue abandoned.

[2]  The facts recounted in this section were elicited at the motion hearing.

dispatcher described the suspect in both robberies "as a black male wearing a traffic style vest, bright colored, with a yellow hardhat." (Tr. at 8.) Detective Heilman recalled the dispatcher's description of the suspect vehicle in the Premier robbery as a "dark colored Dodge Charger," while Detective Slawson recalled the description as a black Dodge Charger. (Tr. at 8, 34.) According to the dispatcher, the suspect in the Americana robbery fled on foot. (Tr. at 50.)

Detective Heilman and Detective Slawson arrived at Americana at 1:40 p.m. and spoke with officers already on the scene. (Tr. at 9.) Americana employees had described the suspect as a black male wearing a bright traffic vest and yellow hardhat. (Tr. at 9.) Detective Heilman's follow-up interviews with two Americana employees and surveillance video footage yielded essentially the same information. (Tr. at 9-10.) Based on the similar descriptions of the suspects and the proximity of the banks' locations, Detective Heilman and Detective Slawson believed the same person had committed the robberies. (Tr. at 10-11, 36.)

Meanwhile, other officers involved in the investigation were pursuing a suspect vehicle, a dark-colored Dodge Charger driven by a black male. (Tr. 11, 37.) Based on license plate information, officers learned that the Charger was registered to Hertz rental car company. (Tr. at 11, 37.) They contacted Hertz and learned that Defendant had rented the Charger and given his address as 1341 Knox Avenue North in Minneapolis. (Tr. at 12, 38.) The officers in pursuit of the Charger attempted to stop the vehicle, but it fled and got away. (Tr. at 12.)

Armed with the suspect's name and address, law enforcement decided to apply for

a search warrant.  (Tr. at 13.)  Detective Slawson drafted the search warrant application and affidavit, while Detective Heilman canvassed the businesses near Americana and asked for any available surveillance footage.  (Tr. at 13.)  Footage from a local business showed a suspect wearing a hardhat and yellow safety vest.  (Tr. at 13.)

### B.   Detective Slawson's Affidavit

The search warrant affidavit drafted by Detective Slawson included the following relevant information.  At approximately 1:00 p.m. on September 12, 2014, a bank in Albertville, Minnesota, was robbed by a black male wearing a construction vest and hat. (Gov't Ex. 1 at 2, Ex. 2 at 2.)  Just after the robbery occurred, a bank employee exited a side door and saw an individual pointing to an area.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)  The employee went to the area to which the person had pointed and saw what he thought was a black Dodge Charger driving away.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)

About thirty minutes after the Albertville robbery, a black male wearing a construction outfit robbed Americana.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)  An officer patrolling the area and responding to the robberies saw a dark grey Dodge Charger, MN license plate 997NMY, driving by on Highway 694 and called for assistance.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)  Several officers attempted to conduct a felony stop of the Charger, and the vehicle eventually pulled over to the right side of the highway.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)  When officers exited their cars and approached, however, the Charger took off and fled at a high rate of speed, ultimately evading the officers.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)

Through license plate information, officers determined the Charger was registered

to Hertz.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)  Upon contacting Hertz, they learned that

Defendant had rented the Charger and given his address as 1341 Knox Avenue North in

Minneapolis.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)  Undercover officers went to 1341 Knox

Avenue North to conduct surveillance and observed Defendant exit a vehicle and go

inside the residence.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)  Defendant was later picked up by

another vehicle, which was stopped by law enforcement, and Defendant was taken into

custody.  (Gov't Ex. 1 at 2, Ex. 2 at 2.)

### C.      The First Search Warrant and Commencement of the Search

Detective Slawson left the Maple Grove Police Department at about 4:00 p.m. to

present the warrant for signature, and arrived at the Hennepin County Government Center

about 5:00 p.m.  (Tr. at 40.)  Hennepin County District Judge Laurie J. Miller signed the

warrant shortly after 5:00 p.m., and Detective Slawson called one of the officers waiting

at 1341 Knox Avenue North to advise him the warrant was signed.  (Tr. at 41.)  In

Detective Slawson's experience, it is not unusual for officers to wait at the premises and

execute the warrant once they receive word it has been signed.  (Tr. at 33.)  Detective

Slawson then left the Hennepin County Government Center for 1341 Knox Avenue

North.  (Tr. at 42.)

Albreta Safford is the sole owner of the 1341 Knox Avenue North property.  (Tr.

at 54.)  Defendant is her nephew and had lived at 1341 Knox Avenue North for nine

months.  (Tr. at 55, 58.)  When the search warrant was executed, Ms. Safford was at

home with her great-grandchildren.  (Tr. at 55.)  She heard a loud noise at the door, and

when she opened it, she saw an officer with a gun in his hand.  (Tr. at 57.)  The officer

pointed the gun at her and told her to get on the floor. (Tr. at 57.) Ms. Safford asked an officer why they were there, and the officer said that someone would tell her later. (Tr. at 57.) An officer showed Ms. Safford surveillance footage from one of the robberies, and she said the suspect looked like Defendant. (Tr. at 57, 59.) At some point, Ms. Safford signed a consent-to-search form for a Chevrolet Malibu, a Cadillac, and the detached garage. (Gov't Ex. 4.)

Detective Heilman and FBI Special Agent Dave Walden arrived at 1341 Knox Avenue North about 5:35 p.m., when officers were beginning to enter the residence. (Tr. at 16.) Detective Heilman had not yet seen the signed warrant. (Tr. at 23.) Once the residence was secure, Detective Heilman and Agent Walden briefed officers on the scene on the items to be seized. (Tr. at 17.) Detective Slawson arrived at the residence about 5:30 p.m., entered the home, and searched Defendant's bedroom for about twenty minutes, but did not find anything of evidentiary value. (Tr. at 42-43.) Detective Slawson then met with Detective Heilman outside. (Tr. at 43.) She showed Detective Heilman the signed warrant, and Detective Heilman noticed that neither the application nor the warrant listed the items to be seized. (Tr. at 18; Gov't Ex. 1.) Detective Heilman told Detective Slawson to return to the police station and prepare a revised application and warrant listing the items to be seized, but he did not suspend the ongoing search. (Tr. at 18, 26.)

### D.   The Second Search Warrant

Detective Slawson returned to the police station and added the items to be seized to the application and the warrant. (Tr. at 18, 44.) She determined which items to list

based on video surveillance from Americana, her interviews of Americana employees, and information obtained from other officers at the scene of the Americana robbery.  (Tr. at 35, 45-46.)  She also listed five marked $20 bills that had been taken during the Americana robbery, about which Detective Heilman had learned in an email from Americana after Detective Slawson left 1341 Knox Avenue North.  (Tr. at 19-20; Gov't Ex. 2.)  Detective Heilman provided the serial number information to Detective Slawson at approximately 6:50 p.m.  (Tr. at 46.)  Detective Heilman also told Detective Slawson to list a cell phone that had been seized from the vehicle in which Defendant was traveling at the time of his arrest.  (Tr. at 20, 27.)  Detective Slawson returned to the Hennepin County Government Center with the new warrant application and arrived about 8:00 p.m.  (Tr. at 47.)  She explained to Judge Miller that the list of items had been omitted inadvertently, but the probable cause affidavit was the same.  (Tr. at 48.)  Judge Miller signed the second warrant, and Detective Slawson advised Detective Heilman by phone.  (Tr. at 48; Gov't Ex. 2.)  Detective Slawson did not return to 1341 Knox Avenue North with the signed warrant.  (Tr. at 48, 52.)

The search of 1341 Knox Avenue North lasted from approximately 5:30 p.m. to 7:30 or 8:00 p.m.  (Tr. at 27.)  After the search concluded, Detective Heilman gave Ms. Safford a copy of the property receipt marked as Defendant Exhibit 1 and a copy of the warrant marked as Government Exhibit 1.  (Tr. at 23-24, 56-67.)  The receipt left with Ms. Safford did not include Item No. 5 listed on Government Exhibit 3 ($7,245 in currency), but did include five additional items that did not appear on Government Exhibit 3, including a reference to a currency bag.  (Tr. at 24, 56; Gov't Ex. 3; Def. Ex.

1.)

## III.    Discussion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend IV.  To that end, every search warrant must be supported by probable cause, supported by a sworn affidavit, and describe with particularity the place to be searched and the items or persons to be seized.  *Id.*

### A.    Probable Cause

With respect to the probable cause requirement of the Fourth Amendment, the task of a judge presented with a search warrant is "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  As the very term implies, probable cause "deal[s] with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

A court reviewing a previous determination of probable cause must give "great deference" to the issuing judge's assessment.  *Id.* at 236 (quotation omitted).  If the issuing judge "relied solely on the supporting affidavit to issue the warrant, 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Etheridge*, 165 F.3d 655,

656 (8th Cir. 1999) (quotation omitted).  The affidavit must establish a "nexus . . .

between the item to be seized and criminal behavior." *Warden v. Hayden*, 387 U.S. 294,

307 (1967).  There must also be a nexus between the contraband and the place to be

searched.  *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000).  "The requisite

nexus between a particular location and contraband is determined by the nature of the

crime and the reasonable, logical likelihood of finding useful evidence." *Etheridge*, 165

F.3d at 657.

Defendant argues that Detective Slawson's affidavit did not establish a sufficient

nexus between the bank robberies and 1341 Knox Avenue North, but the Court concludes

otherwise.  The requisite nexus began with a bank employee's observation of what he

believed to be a black Dodge Charger driving away from the Albertville bank[3] after the

robbery.  This information was relayed to law enforcement, including a police officer

patrolling the area.  The patrol officer saw a dark grey Dodge Charger, MN license plate

997NMY, driving in the search area and suspected it was the vehicle involved in the bank

robbery.

Defendant suggests that the difference in color between a black vehicle and a dark

grey vehicle is significant.  The Court disagrees.  Black and dark grey are extremely

similar, and such a slight discrepancy does not defeat a reasonable suspicion that the

Charger was the vehicle involved in the robbery.  *See United States v. Thompson*, 906

F.2d 1292, 1294, 1296 (8th Cir. 1990) (finding reasonable suspicion where witness

---

[3]  The Court knows the Albertville bank discussed in the affidavit is a branch of Premier
Banks, but the affidavit does not identify the bank by name.  Thus, in this section of the
Report and Recommendation, the Court refers to the bank as the "Albertville bank."

11

described vehicle as silver and blue, even though it was black and blue).  Moreover, the Charger was driving near the location of the robberies, and only minutes had elapsed since the second robbery.  In light of the totality of the circumstances, it was reasonable for the patrol officer to suspect that the dark grey Charger was the same vehicle described by the bank employee, and that the Charger was involved in the Albertville bank robbery.

When pursuing officers attempted to conduct a felony stop of the Charger, the driver fled at a high rate of speed and escaped.  This added to law enforcement's suspicion that the vehicle was involved in criminal activity.  *See United States v. Sawyer*, 588 F.3d 548, 554 (8th Cir. 2009); *see also Slusarchuk v. Hoff*, 346 F.3d 1178, 1183 (8th Cir. 2003) (stating that when a suspect "refused to stop after the officers activated their emergency lights, they had probable cause to arrest him for committing a felony in their presence, regardless of their initial reasons for the attempted stop"); *United States v. Juvenile TK*, 134 F.3d 899, 901, 903 (8th Cir. 1998) ("Police are entitled to be suspicious of vehicular movement that, while not illegal, may be reasonably perceived as evasive.").

Investigating officers determined from the Charger's license plate that the vehicle was registered to Hertz, and Hertz confirmed the car had been rented by Defendant.  The rental agreement listed 1341 Knox Avenue North as Defendant's address.  With this information, the nexus between the Albertville bank robbery and 1341 Knox Avenue North was complete.  The link between Defendant and 1341 Knox Avenue North was further corroborated by officers conducting surveillance, who saw Defendant arrive and depart from the residence.  Defendant's presence at 1341 Knox Avenue North so soon after the robberies also created a link between the residence and contraband or evidence

of a crime, which Defendant could have deposited there.  The Court concludes that the affidavit established the requisite nexus between the bank robberies and 1341 Knox Avenue North.

As a corollary argument, Defendant criticizes Detective Slawson's affidavit for failing to describe the driver of the Charger, state whether the driver and the suspect were similar in appearance, reveal whether the bank employee ever described the driver of the Charger, or disclose whether the Charger was driving fast or erratically as it left the bank. As already noted, the facts set forth in the affidavit were sufficient even in the absence of these additional details to establish the requisite nexus.  Moreover, Defendant has not shown that including this additional information, assuming it was known at the time, would have detracted from the finding of probable cause.  Therefore, unless (1) "the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading," and (2) "the affidavit if supplemented by the omitted information would not have been sufficient to support a finding of probable cause," *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986), the omission of such facts cannot vitiate the warrant.  Here, there has been no showing that facts were omitted with the intent to make the affidavit misleading, or omitted with reckless disregard to whether they made the affidavit misleading.

### B.    Facial Validity of the First Search Warrant

Defendant contends the first search warrant (Gov't Ex. 1) was facially invalid, because neither the warrant nor the application described the items to be seized.  The Government appears to concede that the first warrant did not satisfy the particularity

requirement of the Fourth Amendment, but responds that Detective Slawson's inadvertent failure to include the list of items does not mandate exclusion of the evidence seized, because the error was corrected in a second application and warrant (Gov't Ex. 2), and the evidence would have been either inevitably discovered or acquired through an independent source.  The Government further submits the exclusionary rule does not apply when a law enforcement officer was merely negligent.

A warrant that does not describe the items to be seized violates the Fourth Amendment's particularity requirement.  *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).  When a warrant is deficient to this extent, a court "must regard the search as 'warrantless'" and "presumptively unreasonable."  *Id.* at 558-59.  The Government urges this Court to distinguish *Groh* on the ground that it was a civil *Bivens* action involving qualified immunity, but it is "incorrect to distinguish *Groh* on the basis of its civil origins," *United States v. Allen*, 625 F.3d 830, 838 (5th Cir. 2010).  Accordingly, the Court finds *Groh* applicable here.

The first warrant obtained by Detective Slawson did not list or otherwise describe the items to be seized.  Thus, the warrant was plainly invalid, and the search was presumptively unreasonable.  Although an invalid warrant can be rectified by incorporating by reference another document listing the items to be seized and attaching the document, *see Groh*, 540 U.S. at 557-58, Detective Slawson's affidavit did not list the items to be seized, and the warrant did not use words of incorporation.

*Groh* specifically held that the good faith exception to the exclusionary rule created by *United States v. Leon*, 468 U.S. 897 (1984), does not apply in the present

14

circumstances.  "Given that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid."  *Groh*, 540 U.S. at 563.  "No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional." *Id.* at 564.  When a warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized . . . the executing officers cannot reasonably presume it to be valid."  *Leon*, 468 U.S. at 923.  Based on the clear holdings of *Groh* and *Leon*, the Court finds that the first warrant was fatally defective and that the *Leon* good-faith exception does not apply.

The Government all but concedes that the officers' initial entry into 1341 Knox Avenue North was warrantless and unlawful.  Instead, the Government pins its admissibility hopes on the inevitable discovery doctrine and the independent source doctrine, which are related—but separate—exceptions to the exclusionary rule.

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search."  *Murray v. United States*, 487 U.S. 533, 536 (1988). Application of the exclusionary rule begins "with the premise that the challenged evidence is in some sense the product of illegal governmental activity."  *Nix v. Williams*, 467 U.S. 431, 444 (1984) (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)). Evidence that was obtained illegally does not necessarily become "sacred and inaccessible," however.  *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

15

> [T]he interest of society in deterring unlawful police conduct
> and the public interest in having juries receive all probative
> evidence of a crime are properly balanced by putting the
> police in the same, not a worse, position that they would have
> been in if no police error or misconduct had occurred.

*Nix*, 467 U.S. at 443 (quoted in *Murray*, 487 U.S. at 537).  In recognition of this societal

interest, the Supreme Court has adopted several exceptions to the exclusionary rule,

including the inevitable discovery doctrine and the independent source doctrine.  The

principle underlying both doctrines is that the exclusionary rule should not operate to put

the police in a worse position than they would have been if no error had occurred.  *Id.* at

443-44.

Under the inevitable discovery doctrine, "[i]f the prosecution can establish by a

preponderance of the evidence that the information ultimately or inevitably would have

been discovered by lawful means . . . then the deterrence rationale has so little basis that

the evidence should be received."  *Nix*, 467 U.S. at 444.  The Government must show

(1) that "there was a reasonable probability that the evidence would have been discovered

by lawful means in the absence of police misconduct, and (2) that the government was

actively pursuing a substantial, alternative line of investigation at the time of the

constitutional violation."  *United States v. James*, 353 F.3d 606, 617 (8th Cir. 2003).

In the present case, the Government has not established that it was actively

pursuing an alternative line of investigation at the time of the violation.  According to the

evidence admitted at the motion hearing, the only line of investigation was the

identification and pursuit of the Charger, the information obtained from Hertz leading to

the identification of Defendant and his connection to 1341 Knox Avenue North, and the

16

surveillance conducted at 1341 Knox Avenue North.  Consequently, the inevitable discovery doctrine does not save the challenged evidence from exclusion.

In contrast, under the independent source doctrine, a court may allow the "admission of evidence that has been discovered by means wholly independent of any constitutional violation."  *Nix*, 467 U.S. at 443.  The doctrine applies to both (1) "evidence acquired during an independent lawful search," and (2) "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality."  *Murray*, 487 U.S. at 537.  This second category of evidence can also include tangible evidence that was initially acquired during the unlawful search.  *See id.* at 541-42.  *Murray* recognized that the re-seizure of tangible evidence is not impossible, and that "[t]he independent source doctrine does not rest upon such metaphysical analysis."  *Id.* at 542.  Rather, application of the doctrine must focus on whether "a later, lawful seizure is genuinely independent of an earlier, tainted one."  *Id.*

A search warrant obtained after an unlawful search is not an independent source of evidence if the decision to apply for the warrant was triggered by what officers saw during the initial, illegal entry; or if information obtained during the initial, illegal entry was presented to a judge and affected the decision to sign the warrant.  *Id.*  As phrased by the Eighth Circuit in *United States v. Swope*, a warrant obtained after an illegal search may be an independent source for evidence if the following two questions are answered affirmatively: "first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause

17

after the tainted information has been redacted from them." 542 F.3d 609, 613-14 (8th

Cir. 2008).

The Court answers both questions in the affirmative. First, Detective Slawson's

decision to apply for the second warrant was completely unrelated to what executing

officers saw or learned in the initial, unlawful search. Her decision was prompted solely,

and indisputably, by Detective Heilman's observation that the first warrant failed to list

the items to be seized. Second, no information obtained during the unlawful search was

presented to Judge Miller with the second warrant application. The same probable cause

affidavit provided in support of the first warrant was provided in support of the second

warrant. In addition, Detective Slawson compiled the list of items to be seized based on

her viewing of video footage of the Americana robbery, information obtained from other

officers immediately after the robberies, and her interviews of bank employees. All of

this information was known to Detective Slawson before she applied for the first warrant.

Thus, there is no tainted information to redact.

The Court is aware that seized items may have already been in the police's

possession when the second warrant was signed, but as *Murray* recognized, the "re-

seizure" of evidence does not foreclose the application of the independent source

doctrine. *See* 487 U.S. at 542. Faced with situations where evidence remained in the

police's possession between the unlawful and lawful seizures, courts have not required

the police to return the evidence and literally "re-seize" it. *See United States v. Brooks*,

715 F.3d 1069, 1075-76 (8th Cir. 2013) (where cell phone was seized and searched

unlawfully, and retained by the police pending trial, finding that a search warrant issued a

18

mere eight days before trial was an independent source for the evidence); *United States v. Maxwell*, No. 11-cr-369 (PAM/FLN), 2012 WL 2861372, at *6 n.4 (D. Minn. May 10, 2012) (finding admissible, under the independent source doctrine, evidence illegally seized from a vehicle during an inventory search and then legally "re-seized" pursuant to a search warrant obtained while the car remained impounded by the police), *report and recommendation adopted by* 2012 WL 2859921 (D. Minn. July 11, 2012); *United States v. Terry*, 41 F. Supp. 2d 859, 865 (C.D. Ill. 1999) (where seized currency was kept in the police's possession between unlawful and lawful searches, finding that the police's error was not "the sort the law needs to deter").

In accordance with *Murray*'s direction, the Court has focused on whether the later "re-seizure" was genuinely independent of the earlier one, and has found that it was. Furthermore, applying the independent source exception in these circumstances gives effect to the rationale underlying the doctrine: to put the police in the same position they would have enjoyed, if no police error had occurred. Whether the list of items to be seized had been included from the start, or the scene had been frozen and the search suspended until a valid warrant was obtained, the evidence would have been present on the premises of 1341 Knox Avenue North and would have been validly seized.

Defendant does not contest the constitutionality of the second warrant, and the Court finds it was sufficiently particular and supported by probable cause. Accordingly, the second search warrant provided an independent source for the evidence seized from

1341 Knox Avenue North.[4]

### C.     The Search of the Detached Garage and Vehicles Parked Inside

Defendant argues that Ms. Safford's consent to search the detached garage and vehicles located therein was not voluntary, and thus, the evidence seized from those places should be suppressed. The Government does not argue that Ms. Safford's consent was valid. Rather, the Government responds that Defendant has not shown a legitimate expectation of privacy in the detached garage or the two cars parked inside.[5]

"Fourth Amendment rights are personal and cannot be asserted vicariously." *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000). To challenge the legality of a search on Fourth Amendment grounds, an individual must have a legitimate expectation of privacy in the place searched or the items seized. *United States v. McCaster*, 193 F.3d 930, 933 (8th Cir. 1999). An individual challenging a "search has the burden of showing both a subjective expectation of privacy and that the expectation is objectively

---

[4]  Having found that the evidence seized from 1341 Knox Avenue North should not be suppressed, pursuant to the independent source exception to the exclusionary rule, the Court does not reach the Government's argument that the exclusionary rule should not apply when the police are merely negligent.

[5]  The Government asks the Court not to consider Defendant's challenge to the voluntariness of Ms. Safford's consent because Defendant failed to raise the argument in his initial motion or during the parties' meet-and-confer. District of Minnesota Local Rule 12.1 requires a party seeking to suppress evidence to identify the evidence and the basis for the challenge "[t]o the extent practicable." D. Minn. LR 12.1(c)(1)(B). Both sides are charged with conferring before a motion is filed to "attempt in good faith to clarify and narrow the issues in dispute." D. Minn. LR 12.1(b). The Government has not shown that Defendant intentionally flouted Rule 12.1 or that the Government was prejudiced. Indeed, the Government offered the pre-marked, consent-to-search forms as exhibits at the beginning of the motion hearing, before any testimony was given. Under these circumstances, the Court will not penalize Defendant for failing to timely raise the issue of consent.

reasonable; that is, one that society is willing to accept." *Id.* Relevant factors include "whether the party has a possessory interest in the things seized or the place searched; whether the party can exclude others from that place; whether the party took precautions to maintain the privacy; and whether the party had a key to the premises." *Id.*

Defendant has not established a legitimate expectation of privacy in the detached garage, the Chevrolet Malibu, or the Cadillac. He did not claim a subjective or objective expectation of privacy in these specific places, either in his original motion or in his post-hearing memorandum, nor has he attempted to establish any of the relevant factors. The only evidence before the Court concerning the vehicles is the consent-to-search form signed by Ms. Safford (Gov't Ex. 4), which indicates that she owned the Chevrolet Malibu and the Cadillac parked inside the detached garage. There is no connection described between Defendant and these vehicles whatsoever.

The detached garage is a closer call. It is true that Defendant resided at 1341 Knox Avenue North for a period of nine months before the search, and the Court accepts that he had a legitimate expectation of privacy in the residence. But according to the evidence before the Court, Ms. Safford's cars—not Defendant's—were parked in the garage at the time of the search. There is no evidence that Defendant ever used the garage in the nine months he had lived with Ms. Safford. The garage was detached from the residence, which means that Defendant would not have used it to enter or exit the home. Defendant has not claimed a possessory interest in the garage or the things stored inside, shown that he had permission to use or access the garage, argued that he possessed a key or the code to open the garage, or asserted the authority to exclude others

21

from the garage.

Even if Defendant had established a reasonable expectation of privacy in the detached garage and the cars parked inside, the Court finds that the premises authorized to be searched by the warrant included those places.  A warrant must describe with particularity not only the items or persons to be seized, but also the place to be searched. U.S. Const. amend IV.  A vehicle located on a premises to be searched "is considered to be included within the scope of a warrant authorizing a search of that premises." *Reivich*, 793 F.2d at 963; *see also United States v. Gamboa*, 439 F.3d 796, 807 (8th Cir. 2006); *United States v. Pennington*, 287 F.3d 739, 745 (8th Cir. 2002).  Thus, the Chevrolet Malibu and the Cadillac fell within the scope of the place to be searched.

 Similarly, if a warrant describes the place to be searched as "the premises" of a certain address, the warrant authorizes a search of any buildings found on those premises. *See United States v. Pennington*, 287 F.3d 739, 744 (8th Cir. 2002).  Here, the second warrant described the "premises" to be searched as "1341 Knox Avenue North, Minneapolis, County of Hennepin, State of Minnesota."  (Gov't Ex. 2.)  This broad description included the detached garage.

### D.    Officers' Failure to Possess or Provide a Copy of the Warrant

Defendant suggests that evidence seized from 1341 Knox Avenue North should be suppressed because officers conducting the search did not possess the search warrant when they commenced the search.  But neither the Fourth Amendment nor Federal Rule of Criminal Procedure 41 requires an officer conducting a search to physically possess or present the warrant at the beginning of the search.  *Groh*, 540 U.S. at 562 n.5.

Relatedly, Defendant submits that officers executing the warrant violated the Fourth Amendment because they did not leave a copy of the second warrant at 1341 Knox Avenue North.  However, the suppression of evidence as a remedy for law enforcement's failure to provide a copy of the warrant at any time during a search "is required only if a defendant is prejudiced or if reckless disregard of proper procedure is evident." *United States v. Spencer*, 439 F.3d 905, 913 (8th Cir. 2006).  Defendant has not alleged here that he was prejudiced or that the police recklessly disregarded proper procedure, and the evidence does not support either finding.

## IV.    Recommendation

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence [Doc. No. 27] be **DENIED**.


Dated:  January 26, 2015                  _s/ Hildy Bowbeer_____
                                          HILDY BOWBEER
                                          United States Magistrate Judge


## NOTICE

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 11, 2015** with a writing that specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A district judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Eighth Circuit Court of Appeals.